HOOVER et al. v. FIRST NAT. BANK OF PORT LAVACA, et al. (No. 5783.)

(Court of Civil Appeals of Texas. San Antonio. Feb. 21, 1917. On Motion for Rehearing, March 17, 1917.)

1. ATTACHMENT ☞357—LEVY—LIABILITY.

An ordinary attachment levy upon real estate will not authorize recovery of damages, since any depreciation in the property's value between the levy and release is not regarded as due to the attachment.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1307, 1309, 1310.]

2. ATTACHMENT ☞361—WRONGFUL—LIABILITY.

An attachment, wrongfully levied upon real estate with knowledge that the owners were negotiating a sale thereof which they completed without knowledge of the levy, is actionable although the contract was not completed prior to the levy.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1315–1318.]

3. ATTACHMENT ☞375(3)—WRONGFUL—MEASURE OF DAMAGES.

Where a wrongful attachment prevented real estate owners from consummating a sale, the measure of damages is the difference between the contract price and the property's market value when sold on mortgage foreclosure while the attachment was still in force.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. § 1384.]

4. ATTACHMENT ☞373—WRONGFUL—SUFFICENCY OF PLEADING.

In action for wrongful attachment, allegations that plaintiffs had arranged a sale to parties able to pay for the land, and that the actual market value was much less when sold at a foreclosure sale, sufficiently alleged actionable damages as against a general demurrer.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1356–1362, 1395–1397.]

5. ATTACHMENT ☞373—WRONGFUL—PLEADING.

In action for wrongful attachment, allegations that plaintiffs' proposed sale of real estate was broken up by the attachment levy are sufficient 'despite the improbability of a trade for some $137,000 being interrupted by attachment for some $4,000, with large partial payments already made.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1356–1362; 1395–1397.]

6. ATTACHMENT ☞373—WRONGFUL—PLEADING.

In an action for wrongful attachment, allegations that plaintiffs had closed a contract for selling the real estate with the exception of consolidating several abstracts already approved by the purchaser, and that such consolidation would have been made, sufficiently showed performance of the contract.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1356–1362, 1395–1397.]

7. ATTACHMENT ☞58—PROPERTY SUBJECT TO —EQUITY IN REAL ESTATE.

One not holding the legal title of real estate, but to whom the record owner has promised a portion of proceeds obtained from a proposed sale thereof, has an attachable interest in the property.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 131, 149, 159.]

8. ATTACHMENT ☞373—WRONGFUL—PLEADING.

In a wrongful attachment action, allegations that extension of a mortgage on plaintiffs' property depended on closing a prospective sale sufficiently negatived the contention that the mortgage, and not the attachment, caused the sale's failure.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1356–1362, 1395–1397.]

9. APPEAL AND ERROR ☞231(2)—EXCEPTIONS —SUFFICIENCY.

A special exception from which it is impossible to tell what portions of the pleadings are objected to is too general for consideration.

10. ATTACHMENT ☞373—WRONGFUL—PLEADING.

In a wrongful attachment action, allegations that a prospective buyer had partly performed by assuming a debt and making part payments were proper as showing the terms and extent of compliance with the contract.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1356–1362, 1395–1397.]

On Motion for Rehearing.

11. ATTACHMENT ☞373—WRONGFUL—PLEADING.

In a wrongful attachment action, allegations that the attaching creditors' statement that the debtor was about to dispose of his property with intent to defraud, etc., was false and known to be false is sufficient, although the pleadings

established the property was to be disposed of without cash return.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1356–1362, 1395–1397.]

12. ATTACHMENT ☞357—WRONGFUL—WHAT CONSTITUTES.

An attachment may be wrongful if the grounds on which it is based are untrue, although defendant landowner owes a past-due debt.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1307, 1309, 1310.]

13. ATTACHMENT ☞373—WRONGFUL—PLEADING.

In a wrongful attachment action for breaking up a proposed sale, allegations that the prospective purchaser was to give notes which he was able to pay, and that a mortgagee had agreed to extend his debt until such notes were due, allege damages with sufficient certainty.

[Ed. Note.—For other cases, see Attachment, Cent. Dig. §§ 1356–1362, 1395–1397.]

Appeal from District Court, Calhoun County; John M. Green, Judge.

Action by the First National Bank of Port Lavaca, Tex., and others against A. J. Hoover and J. O. Hartzog. Judgment for plaintiffs, and defendants appeal. Reversed and remanded. Motion for rehearing overruled.

S. S. Searcy, of San Antonio, for appellants. Wilson & Hamilton, of Port Lavaca, and Proctor, Vandenberge, Crain & Mitchell, of Victoria, for appellees.

MOURSUND, J. The First National Bank of Port Lavaca, Tex., on April 3, 1914, sued appellants, Hoover and Hartzog, for $4,209.91 upon their promissory note payable to plaintiff. Plaintiffs at the time of filing suit caused an attachment to be issued and levied upon 640 acres of land in Calhoun county belonging to Hoover. On July 21, 1914, plaintiff caused a second writ of attachment to be levied on about 6,000 acres of land. The ground alleged for said attachments was "that said defendants are about to dispose of their property with the intent to defraud their creditors, and that each of the defendants is about to dispose of his property with the intent to defraud his creditors." The defendants admitted the execution of the note sued on, but by plea in reconvention alleged that the second attachment was wrongfully and maliciously sued out, and sought to recover actual damages against plaintiff and the sureties on the attachment bond, W. W. Noble and Willett Wilson, in the sums of $25,000 for Hartzog and $70,000 for Hoover, although the bond was only for $8,500, and exemplary damages as against plaintiff for $50,000. A general demurrer and eight special exceptions having been sustained to such plea in reconvention, defendants declined to amend, and the court rendered judgment for plaintiff upon his demand, and dismissed the plea in reconvention. Defendants appealed, and assign as error the rulings with respect to such plea in reconvention.

The allegations in said plea with reference to the wrongfulness of the issuance and levy of the attachment are sufficient.

Defendants alleged that they made a sale of 2,915½ acres of land decribed in the plea in reconvention, owned by them, to Oscar Lusk of Bell county. They allege, in substance, that defendant Hartzog was to receive from such sale stock in the National Equitable Society of Belton for $25,000, and that Hoover was to receive stock in said society in the sum of $53,700; that Hoover was to receive notes for $23,000, due September 1, 1915, secured by lien on 1,000 acres of the land, and a note for $22,819.80, due September 1, 1915, secured by lien on the other 1,915½ acres of land; that Lusk was to assume the payment of $12,835.84 due on said 1,915½ acres to George P. Brown; that notes for $10,000 due J. J. Welder, secured by the 1,000 acres, were to be paid off by Hoover out of proceeds derived from the collection of the $23,000 notes; that notes for $18,187.-25, due J. J. Welder, secured by lien on said 1,915½ acres of land, were to be paid off by Hoover; that all of the notes by Lusk were to be deposited in bank, under an agreement that the bank was to pay off out of the proceeds thereof, when collected, the notes due Welder, and that Welder had agreed, in case the sale to Lusk was consummated, he would extend his notes to September 1, 1915. It is alleged that deeds to Lusk were made; that notes were made by him and placed in bank, with the $53,700 stock which was to go to Hoover; that the $25,000 stock had been delivered to Hartzog, and that Lusk had made a deed of trust and note to Brown, who, in consideration thereof, had canceled his note and released his lien. It is further alleged that between the date of the delivery of the release by Brown and the recording of the deed of trust by Lusk to Brown the attachment complained of was levied upon the lands which Lusk was to receive. It is then alleged "that prior to July, 1914, when the sale above set out was made to said Lusk," Hoover and Hartzog had been negotiating with Lusk for a sale of the land, and had furnished him abstracts of title thereto in different abstracts, which had been examined by Lusk's attorney, and objections pointed out; that while these objections were being cured the sale had been consummated conditionally by the execution and delivery of deeds to Lusk; the execution of notes by Lusk "in accordance with said contract of sale, as above set out"; the delivery of the notes and the stock coming to Hoover under said contract of sale to the Victoria National Bank under the agreement above mentioned providing for payment of the Welder notes; and further providing that the stock to Hoover was to remain in possession of the bank until the different abstracts of title had been made into one abstract and delivered to Lusk

for final acceptance; that all objections to the title had been cured to the satisfaction of Lusk's attorney, and the only thing remaining to be done was to bring the several abstracts into one abstract and deliver it to Lusk for a final and complete consummation of said sale; that in accordance with such understanding, about August 20, 1914, Hoover requested the Calhoun County Abstract Company, which had made the abstracts, to make one abstract for all of said property by compiling all of the abstracts into one; that up to October 27, 1914, said abstract had not been delivered to Hoover.

The attachment complained of was issued July 21, 1914, and levied on July 29, 1914. Defendants alleged that they had no knowledge of the issuance and levy of said attachment until the ———— day of October, 1914; that Hoover was preparing to extend until September 1, 1915, a debt due the Victoria Loan Company secured by lien upon other lands than those conveyed to Lusk, when on the ———— day of ————, 1914 he was served with citation in a suit filed by said company, and was advised by said company that it was "forced to bring said suit, said indebtedness being past due and arrangements for an extension not having been made, because of the attachment liens filed against said land by the plaintiff bank. It was alleged that on account of failure to consummate the sale to Lusk, Hoover was unable to extend said indebtedness to September 1, 1915, and to keep said lands from being sold by said company, and lost an equity therein of $19,000. They alleged that on October 28, 1914, Lusk advised them by letter that he had received information of the levy of the attachment, and that such levy was made before he received the deeds, and for that reason he demanded a rescission of the trade and return of the stock and notes which were given in part payment for the lands; that defendants endeavored to induce Lusk to go on with said trade, but he refused to do so, and declared same canceled and at an end, and defendants were forced to return to him the notes and stock actually delivered in part payment for the land. They further alleged that they endeavored to arrange for money necessary to release the attachment, but were unable to do so owing to stringency in the money market due to low price of cotton and European war, and were unable to replevy the property; that about the time the sale to Lusk was broken up war was declared in Europe, the price of cotton declined, and said land depreciated in value to the extent of $20 per acre. They then alleged diligent but unsuccessful efforts to sell the land; the sale thereof by Welder under his deed of trust in May, 1915, and that the land failed to bring the amount of Welder's debt; depreciation in value at the time of such sale to the extent of $20 per acre below the reasonable market price at the time of the sale to Lusk, and at which it was alleged the sale was made to Lusk. It was further alleged that Lusk is a man of means, and was amply able to deliver the stock in said society and to pay off and satisfy at maturity the notes executed by him, and would have done so but for the levy of the writ of attachment; that the stock in said society "was, at the time it was delivered to defendants, and still is, reasonably worth par." It was further alleged that plaintiffs at the time they caused the attachment to be levied knew, or by the exercise of reasonable diligence would have known, that defendants were negotiating for a sale of said land to Lusk, and that same was about to be consummated, and cause said attachment to be issued and levied for the purpose of breaking up said trade.

[1] It is well settled that an ordinary levy upon real estate will not authorize the recovery of damages, the theory being that if any depreciation occurs between date of levy and date of release of attachment, such depreciation is not caused by the attachment proceedings. In the case of Trawick v. Martin-Brown Co., 79 Tex. 460, 14 S. W. 564, a judgment sustaining a general demurrer to a plea in reconvention was affirmed, in which plea it was alleged, in addition to many other things, that the defendant "lost and was damaged $1,000 by being prevented from selling his real estate." The court said:

"It is true that it is alleged that the levy prevented the defendant from making a sale of the real estate levied upon. Ordinarily, as we take it, where the defendant, as in this case, owes the debt for which he is sued, a levy upon real estate can have no such effect. If he can find a purchaser he can pay the debt, as he ought to do, and discharge the lien. However, we do not wish to be understood as holding that in no case can a levy of an attachment upon real estate cause damages recoverable in law. An advantageous bargain already agreed upon might be defeated by the wrongful levy of an attachment, and direct loss might result to the owner from subsequent depreciation in the value of the property. We are not prepared to hold that in such a case the loss might not be recovered. The allegation in this case is that by reason of the levy upon defendant's real estate 'he was, and has been ever since, hindered and prevented from selling the same, or any part thereof, and liquidating his debts with the proceeds thereof, which he could and would have done had not said attachments been levied thereon as aforesaid, to his damage $1,000.' He does not allege that he had an opportunity to sell, and that the sale was defeated by the levy of the attachment, and that the property has depreciated in value since that time."

[2] It was held that if there be no pending trade at the time the attachment was levied, a trade subsequently negotiated would be insufficient as a basis for damages. Drew v. Ellis, 6 Tex. Civ. App. 507, 26 S. W. 95. However, it was not alleged in that case that negotiations had been begun before the levy, and that such fact was known to the attaching creditor, and that the negotiations culminated in a trade while the levy was in force. In this case it is impossible to tell from the allegations whether the contract or trade was made prior to the levy of the attachment or afterwards, but it is

alleged that plaintiff had knowledge that the trade was about to be made, and if it was made after the levy, the allegations show that it was made without knowledge, upon the part of defendants or Lusk of the levy having been made. We believe that in such a case the rule would be the same as if a contract had already been entered into.

[3] Defendants undertake to allege facts showing that they suffered damages, but the allegations are vague and indefinite, and fail to disclose any definite idea as to the measure of damages intended to be relied upon. It has been held that the measure of damages is the difference between what the debtor would have received had his trade not been broken off and the value of the land immediately after the attachment was released. Nixon v. Bank, 60 Tex. Civ. App. 7, 127 S. W. 882. This holding was evidently made with the view of complying with the intimations in several cases that the loss by depreciation occurring after the breaking up of a trade would be directly caused by the levy of the attachment. See Girard v. Moore, 86 Tex. 675, 26 S. W. 945; Tillman v. Wetsel, 31 S. W. 433. In accordance with these intimations and the holding so made it appears that in this case the measure of damages would be the difference between the value of what the defendants would have received had the trade been consummated and the market value of the land at the time it was sold by Welder under his deed of trust, the plea in reconvention disclosing that the attachments had not been released or quashed at that time.

[4] It is alleged that the stock, which was of the par value of $78,700, and to be accepted for said amount by defendants, was at the time it was delivered to defendants, and still is "reasonably worth par." It was also alleged that Lusk is a man of means, and was amply able to deliver said stock and pay off said notes made by him at their maturity. It was also alleged that at the time Welder caused the land to be sold it was worth $20 per acre less than its reasonable market price at the time the sale to Lusk was made and at which it was sold to Lusk. These allegations, in connection with the statements as to damages suffered by each, we think were sufficient as against a general demurrer to show that defendants suffered damages such as are collectible under our decisions. Foster v. Bennett, 152 S. W. 233.

[5] We are also of the opinion that as against a general demurrer the allegations sufficiently show that the trade was broken up by Lusk on account of the levy of the attachment. The allegations must be taken as true regardless of the improbability of a trade for about $137,000 being broken up by an attachment for about $4,200 when the sellers had already received $25,000 worth of valuable stock and were to receive about $53,000 more in stock, all of which could be devoted to raising the necessary $4,200. By special exceptions the defendants should be required to allege specifically the terms of their contract with Lusk, in order that the rights of the parties with respect thereto may be seen.

The so-called special exceptions sustained by the court were, in the main, general demurrers.

The first and third exceptions need not be discussed, as they are disposed of by what we have said above.

[6] By the second exception it is contended that defendants have not alleged facts showing that they, or either of them, ever complied with the terms of their sale to Lusk or placed themselves in a position or had the right to demand a compliance by Lusk with the terms of any such sale. This contention, we presume, is the same as was made in aid of the demurrer, namely, that the combining of the various abstracts had to be completed before they could demand that Lusk close the trade. It was alleged that this was being done; that the contents had already been approved in separate abstracts, and that such abstract would have been furnished and the trade closed had it not been for the levy of the attachment. Such allegations were sufficient as against the exception.

[7] The fourth exception was as follows:

"And, further specially demurring to the said plea, the First National Bank and W. C. Noble and Willett Wilson say the same is insufficient, particularly as to J. O. Hartzog, because by the allegations thereof no enforceable agreement or contract is alleged connecting him with the title to any part or portion of the lands alleged to have been sold to Lusk, and said pleading fails to connect said J. O. Hartzog in any manner with title to said lands, or any of them, and to show any title or right of action in him as against the said bank, Noble and Wilson, or either of them."

While it is alleged in general terms that Hartzog and Hoover owned the lands, further on in the petition Hartzog's connection with the transaction is explained as follows: That, prior to the sale to Lusk, Hoover had conveyed to Hartzog 960 acres of land, in part consideration for which Hartzog gave notes to Hoover for $20,300, on which at the time of the transaction with Lusk there was due the sum of $23,000; that Hoover had also, prior to the sale to Lusk, conveyed to Harry McEverly 1,000 acres of the lands included in the sale to Lusk; that Hartzog, in consideration of the cancellation of the notes due by him to Hoover, conveyed to McEverly, on July 6, 1914, the 960 acres, and in consideration thereof McEverly conveyed to Hoover the 1,000 acres owned by him. It is then explained that under such agreement Hoover was to deed Hartzog the 1,000 acres received from McEverly, but the deed was not executed because under the trade with Lusk it was agreed between Hoover and Hartzog that the 1,000 acres should be conveyed to Lusk by Hoover, and Hartzog was to receive $25,000 in stock while Hoover

would receive notes from Lusk for $23,000. By this complicated transaction it appears that Hoover canceled $23,000 worth of notes due him by Hartzog on the 960 acres, and was to receive $23,000 worth of notes by Lusk out of which he was to pay off $10,000 due Welder on the 1,000 acres, and that Hartzog, for his equity in the 1,000 acres, was to receive $25,000 in stock. It was alleged that the deeds were filed prior to the levy of the attachment complained of, so it is evident that Hartzog, at that time, was not the record owner of any of the land, but had an agreement with Hoover to receive $25,000 for his equity in the 1,000 acres. This is further shown by the fact that the deeds to Lusk were all executed by Hoover.

Defendants levied upon such interest in the lands as both Hartzog and Hoover had, and we believe the levy attached to Hartzog's equitable interest therein. The case of Chase v. York Savings Bank, 89 Tex. 316, 36 S. W. 406, 32 L. R. A. 785, 59 Am. St. Rep. 48, differs materially from this one. In fact, while we find no Texas case directly in point, the expressions in the Chase Case and the cases therein discussed, as well as in the case of O'Neal v. Clymer, 61 S. W. 545, lead us to the conclusion that there is no merit in defendant's contention that Hartzog had no interest subject to attachment.

[8] The ninth exception was also without merit. It was not alleged that the trade with Lusk depended upon a binding contract with Welder to extend his notes, but that the extension of Welder's notes depended on the consummation of the trade with Lusk. This was sufficient to negative the idea that Welder's debt was the real cause of the trade being broken off. No damages are sought because Welder foreclosed. His foreclosure is material for the purpose of explaining when and how defendants parted with the title to the land.

[9, 10] The eleventh special exception was entirely too general to require consideration, for it is impossible to tell what portions of the pleading are objected to. However, in appellee's statement, we find that the allegations held in view by them were those relating to the Brown transaction and the one to the effect that $25,000 worth of stock had been delivered to Hartzog and returned to Lusk after the sale was broken off. The assumption of the Brown debt was part of the consideration to be paid by Lusk, and the allegations were proper to show the contract and to what extent it had been executed. The allegation with regard to delivery and return of stock was also proper.

All assignments are sustained; the judgment is reversed, and the cause remanded.

#### On Motion for Rehearing.

[11] We did not state the allegations charging that the attachment was wrongful, as we did not think any issue could be raised in regard to their sufficiency. Defendants alleged that the statement that they were about to dispose of their property with intent to defraud their creditors was false, and that plaintiffs knew it was false. Appellees contend in their motion that the pleadings show the absolute truth of the grounds set out, basing the contention on the fact that no cash was to be received from Lusk and no preparations are alleged to have been made to settle plaintiffs' debt. In passing on a general demurrer, we must take the allegations as true, and indulge every reasonable intendment in favor of their sufficiency. The matters relied upon do not show the falsity of the unequivocal allegation relating to the want of ground for issuance of attachment.

Appellees also contend that we erred in holding that, even though no contract had been completed for the sale to Lusk when the levy was made, the averments were sufficient. In the case of Wetsel v. Tillman, 3 Tex. Civ. App. 559, 22 S. W. 980, cited by appellees in their motion for rehearing, the levy was made on January 4, 1889, and the opportunity to sell was alleged to have come on March 1, 1889. Plaintiff alleged his damages as the difference between what he could have sold the land for on March 1, 1889, and the value of the land at the time the attachment was released. Chief Justice Tarlton held that the petition contained averments of special damages recoverable under the rule laid down in Trawick v. Martin-Brown Co., 79 Tex. 460, 14 S. W. 564, and remanded the cause for a trial. Upon a second appeal of said case 31 S. W. 433, the judgment in favor of plaintiff was reversed on account of the admission of certain evidence, and Judge Stephens said:

"It may be that appellee should also have gone further, and shown that appellant, in procuring and retaining his attachment on the property, under the circumstances, had, at least through his agent or attorney, such knowledge, actual or constructive, of the peculiar situation relied on by appellee for recovery, as to bring the damaging result reasonably within contemplation."

The question so stated was not decided, nor do we find any case in which it is decided, and in passing on the cross-action in this case it need not be decided, for defendants fully covered this point in their pleadings. It is very clear that the decisions in said case are to the effect that there need not be a binding contract for the sale of the land in existence at the time the levy is made. The facts alleged in this case are even stronger, for it is alleged that negotiations were pending at the time the levy was made, and that plaintiffs knew of such fact, and also that after defendants received actual notice of the levy they endeavored to arrange for the money necessary to release the attachment, but after diligent efforts were unable to do so by reason of the stringency in the money market on account of the European war, and were unable to replevy

the property, not being in a position to furnish the necessary security to obtain the proper sureties on a replevy bond.

[12] Appellees also virtually contend that if the owner of the land owes the debt and it is due, an attachment levied thereon cannot be wrongful, no matter how untrue the grounds on which it is based. This contention is without merit, and we need only refer to the case of Trawick v. Brown, supra, cited by appellees, to destroy the contention. In that case the court held that the attachment was wrongful, and sustained the demurrer only because of failure to show damages proximately caused by the levy. In the case of Drew v. Ellis, 6 Tex. Civ. App. 507, 26 S. W. 95, there are certain expressions tending to sustain appellees' theory, if it be not borne in mind that the court was passing on a fact case, and not on averments being tested by a general demurrer. The court distinguished the case from the Wetsel v. Tillman Case on the ground that Ellis owed the money, and then proceeded to state that Ellis, who was shown to have large means, should have paid off the debt and released the attachment which rested on the land for some months before any offer was made. The opinion does not disclose the pleadings in the case, so we cannot say whether Drew pleaded that Ellis, although able to do so, negligently failed to prevent or minimize damages, or whether the court was of the opinion that this could be shown, although not pleaded, and that the fact that Ellis was amply able to pay the debt and thus prevent the damage incident to the loss of the sale would preclude him from charging such loss to the levy of the attachment. But the facts proved in that case are very different from those alleged in this case, which must be taken as true in passing on the general demurrer. The decision of the Drew-Ellis Case was correct, regardless of whether it is or is not the duty of the owner to take such steps as are within his power to prevent damages, for the facts proved wholly failed to show that the trade would have been made.

We are unable to find any basis for appellees' statement that the "sale of the land to Lusk included the land levied on by the first writ of attachment." It is allowed that the first attachment was levied upon subdivisions 12, 13, 14, and 16 of survey 1 of L. A. Gueringer's surveys, and we fail to find these subdivisions mentioned in the list of the lands alleged to have been sold to Lusk. The argument, therefore, that "if appellants' contention is correct, the levy of the first writ of attachment would have prevented the sale to Lusk" is without merit, being based upon an erroneous assumption in regard to the pleadings.

[13] It is contended that as the suit was filed on November 3, 1914, and the notes of Lusk were to be placed in the bank until September 1, 1915, at which time Welder was to be paid out of the proceeds, defendants could not recover unless it was shown that Lusk would have been able to pay his notes and thus pay Welder. It is alleged that Welder agreed to extend his debt to September 1, 1915, and that Lusk was a man of means and amply able to pay off and satisfy the notes executed by him. It was also alleged that the stock was reasonably worth par value. These allegations must be taken as true, and, when so taken, it appears that the damages are alleged with reasonable certainty.

Appellees again contend that Hartzog had no such interest or estate in the 1,000 acres of land as would be liable to execution, and cite the cases of Moses v. Tucker, 87 Tex. 94, 26 S. W. 1044, and Boone v. Bank, 17 Tex. Civ. App. 365, 43 S. W. 594. In the first-named case, the rule is stated that no property or interest therein is subject to execution or like process unless the debtor, if sui juris, has power to pass title to such property or interest in property by his own act. We cannot agree with the contention that Hartzog could not pass title by his own act to his interest in the 1,000 acres which Lusk was to convey him. His ownership was in the nature of a resulting trust, but that would not prevent him from conveying his interest. If the attachment had been rightfully levied and we were called upon to say whether plaintiffs acquired a lien on the interests of both Lusk and Hartzog on the 1,000 acres, we feel that we would be compelled to say that the lien covered the interest that each of them held, and that a purchase under foreclosure would take the title from any equities in favor of Hartzog.

The motion for rehearing is overruled.